***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The employee-employer relationship existed between the parties at all relevant times.
4. N.C. Farm Bureau Mutual Insurance Company was the carrier for defendant-employer at the time of the alleged incident.
5. The date of the alleged incident was 26 September 2001.
6. Plaintiff's average weekly wage was $538.46, which yields a compensation rate of $358.99 per week.
7. The issues for determination are:
a. Whether plaintiff suffered a compensable back injury on 26 September 2001?
b. To what, if any, compensation is plaintiff entitled?
8. The parties stipulated the following documentary evidence:
a. Stipulated Exhibit #1: Plaintiff's Medical Records
b. Stipulated Exhibit #2: Industrial Commission Forms
c. Stipulated Exhibit #3: Recorded Statement
d. Stipulated Exhibit #4: Discovery Responses
e. Stipulated Exhibit #5: Payroll Records
f. Stipulated Exhibit #6: Personnel Records
g. Stipulated Exhibit #7: Surveillance Records
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 38 years old. Plaintiff had completed high school and had an Associate's degree in business from Fayetteville Technical Institute.
2. Plaintiff was employed by defendant-employer for approximately six and one half years as of 26 September 2001. Plaintiff was employed as a billing clerk and her job duties consisted primarily of billing turnover and office management. She worked in the office approximately three days per week and at home two days. Plaintiff's supervisor was Dr. Toni Harris.
3. Prior to 26 September 2001, plaintiff had a history of injury to her low back and tailbone as a result of a slip and fall in March 1999. She received treatment for her injuries from physical therapist, Willem Klokman, from 2 March 1999 through 11 September 2001. During this time, plaintiff continued to experience upper and lower back pain, neck pain, tailbone and lower extremity pain and headaches, all of which increased at times due to various activities, including driving a 4 wheeler, moving cabinets, pulling a garage door and increases in stress.
4. On Wednesday, 26 September 2001, plaintiff was engaged in helping clean out defendant-employer's Whiteville office that was being closed. Plaintiff slid a desk away from the wall to gain access to an electrical outlet. Later, plaintiff attempted to pick up a bag filled with folded linen. When she did so, she felt an immediate sharp pain in her back. Plaintiff reported the incident to co-employee Marilyn Cribb and discussed the incident with Dr. Toni Harris by telephone. Plaintiff continued to work for approximately three hours after the incident, then left the office to obtain Advil for the pain.
5. Dr. Harris authorized plaintiff to be out of work on Thursday and Friday, 27 and 28 September 2001, and plaintiff was off for the weekend. On Tuesday, 2 October 2001, Dr. Harris, plaintiff's supervisor, examined her. She ordered an MRI of plaintiff's spine, which was performed on 8 October 2001 and showed "mild to moderate diffuse bulging of the [L3-4] disc slightly asymmetric to the left in the foramina without effect upon the exiting left L3 nerve root. Mild underlying central and lateral recess stenosis." At the L4-5 level, the MRI showed "small central subligamentous disc herniation along with mild underlying central and lateral recess stenosis." Dr. Harris reviewed the MRI and referred plaintiff to orthopedic surgeon Dr. Mark Rodger.
6. Plaintiff presented to Dr. Rodger on 11 October 2001 and gave a history consistent with injuring her back at work when picking up a sack of laundry. In addition to her back pain, plaintiff's pain was radiating into her left leg. After examining plaintiff and the MRI results, Dr. Rodger diagnosed plaintiff with an annular rupture on the left at the L3-4 level, which he related to a reasonable degree of medical certainty to her lifting injury on 26 September 2001. He recommended a non-operative program of therapy and discussed with plaintiff the possibility of pain management injections.
7. Plaintiff returned to Dr. Rodger on 30 October 2001 with some continuing back pain that increased during the course of a day and some leg pain. On 6 November 2001, Dr. Rodger saw plaintiff for the final time. Plaintiff had an increase in her leg pain and the back pain persisted. Dr. Rodger referred plaintiff to Dr. John Knabb for pain management. Dr. Rodger scheduled plaintiff to return to him following the treatment by Dr. Knabb, but plaintiff did not return.
8. On 15 October 2001, plaintiff began treatment with physical therapist, Donald Jarboe. Plaintiff gave a history of chronic neck and upper and lower back pain and having received treatment from physical therapist Willem Klokman for approximately three years; more than once a week to start and then every three to four weeks during the last year.
9. Mr. Jarboe treated plaintiff for a total of ten visits. Based upon his opinion as a physical therapist, Mr. Jarboe testified that the mechanical dysfunction that plaintiff had when she started treatment with him had fully resolved by the final treatment date of 7 November 2001; however, plaintiff had atypical changes in her subjective pain level and pain distribution especially in her legs below the knee. He further noted that "there was a large amount of pain behavior, but we could not identify anything on physical examination that would cause the pain behavior." Dr. Rodger testified that he could not either medically substantiate or refute Mr. Jarboe's opinions.
10. On 12 November 2001, plaintiff reported to work and was informed that she had been terminated. Defendant-employer contends plaintiff's employment was terminated for having outstanding insurance claims that were not collected. Specifically, plaintiff indicated to Dr. Harris that she was getting behind and needed another employee to assist her with billing. Dr. Harris instructed plaintiff to bring in all of the uncollected bills that she had at home, and Dr. Harris indicated that she would divide the work. Plaintiff returned a file of bills from home, which she stated were all of the uncollected billing statements. Plaintiff neglected to return several uncollected medical bills and reimbursement checks written to Medicaid that were never mailed. The outstanding claims totaled $20,000.00 — some of which were too old to collect.
11. On 26 November 2001, plaintiff presented to orthopedic surgeon, Dr. William Mills, with complaints of pain in her lower back associated with pain in both of her legs. Plaintiff attributed the pain to the work injury of 26 September 2001. Dr. Mills examined plaintiff and reviewed the MRI. Dr. Mills diagnosed plaintiff with disc bulges at L3-4 and L5-S1, with a herniation at L4-5. He recommended a series of steroid shots in plaintiff's lower back. Plaintiff received two of the injections prior to the next visit on 2 January 2002, and reported improvement in her symptoms. Also on 2 January 2002, plaintiff complained for the first time of difficulty with urination. Dr. Mills referred plaintiff to urologist Dr. Keith Gawith.
12. Plaintiff presented to Dr. Gawith on 11 January 2002. Dr. Gawith diagnosed plaintiff with neurogenic bladder and related the problems to the 26 September 2001 injury. However, Dr. Gawith also noted that when neurogenic bladder problems are the result of a specific injury, he would expect the problem to manifest quickly after the incident. When informed that plaintiff's symptoms did not appear until approximately three months after the work incident, he opined that it was less likely that the 26 September 2001 incident was the cause of the problem. He further opined that the condition could be related to plaintiff's longstanding degenerative back condition, and that in some cases, the condition appears without a known cause. He treated plaintiff with medication, and although plaintiff showed some minor improvement, Dr. Gawith opined that plaintiff would probably need periodic evaluation for a lengthy period of time if not for the rest of her life.
13. Plaintiff continued to treat with Dr. Mills for lower back and right leg pain. Dr. Mills ordered a second MRI, which showed the same problems with the L3-4, L4-5 and L5-S1 discs, with the herniation at L4-5. On 29 April 2002, a discography was performed on L3-4 and L4-5, but the test results showed that the rupture was at L3-4 instead of L4-5. Based on the test results, Dr. Mills recommended an IDET procedure at both the L3-4 and L4-5 levels. The procedure was not approved and has not been performed.
14. Dr. Mills last saw plaintiff in December 2002. He assessed plaintiff with chronic low back pain and released her with the recommendation that she seek pain management assistance. Based upon the history provided by plaintiff that her pain began following the 26 September 2001 incident at work, Dr. Mills opined that plaintiff's condition was causally related to the work injury.
15. On 1 October 2002, plaintiff presented to neurosurgeon Dr. Matthew Ewend. Plaintiff gave a history of an onset of back and leg pain beginning after the incident of 26 September 2001. Dr. Ewend reviewed plaintiff's MRIs and found lumbar stenosis, with bulging of several discs, particularly in the L4-5 level. He diagnosed plaintiff with low back pain with a component of radiculopathy on the right side. He ordered an EMG and nerve conduction test, which were both relatively non-specific.
16. Due to the length of time plaintiff's condition had persisted, Dr. Ewend performed a laminectomy on 13 January 2003 at the L4-5 level. By 13 May 2003, plaintiff reported improvement in her leg pain, but continuing back pain. Dr. Ewend opined that her condition was related to the incident of 26 September 2001. He noted that in determining the causal relationship that "the most important determinant of that is the history that the patient gives me." He further noted that plaintiff told him that the pain started at the time of that injury, "and I think that's the most powerful argument and so I think it's likely that is when the onset of her pain and discomfort was."
17. At the time of his deposition, Dr. Rodger reviewed the medical records of Drs. Mills and Ewend, the physical therapy records of Mr. Jarboe, the two MRIs, the discogram and EMG results and was apprised of plaintiff's pre-injury treatment by Mr. Klokman for the first time. While initially he had related plaintiff's condition solely to the incident of 26 September 2001, upon examination of plaintiff's treatment and medical history, he changed his opinion. He stated that in his opinion, "it's more likely than not that her surgical pathology and her surgery was not related to her injury."
18. Dr. Rodger based his opinion on the fact that "her symptoms were in the back, into the front of her thigh on the left after her lifting injury." He noted that these symptoms "related to an injury to the L3-4 disc, which subsequently, some months later, was re-scanned and appears to be improved now, from what it had been at the time of the original scan. And, her symptoms after a couple of months, the original symptoms of radiation into her left leg, seem to have changed substantially, both to me as well as to one therapist, Mr. Jarboe, and switched from the left leg more to the right leg in a different nerve distribution, rather than an anterior thigh L4 like symptom into an L5 like symptom in the back of the thigh. I think this change, at least two months after her initial injury, in my opinion, more likely represents progression of her disease at different levels."
19. Based upon the timing of plaintiff's complaints of right leg pain following her injury, Dr. Rodger opined that "it's maybe 40% likely that her symptoms in the right leg are related to her lifting injury and it's perhaps 60% likely that they are not." Regarding plaintiff's surgery, he opined "I think my feeling would be it's even more unlikely to be related to her original injury in September. Perhaps 10% or something." Dr. Rodger was of the opinion that plaintiff reached maximum medical improvement by the end of 2001 and that he would assign plaintiff a 5% permanent partial impairment of the back as a result of her injury.
20. Because Dr. Rodger is the only physician who based his opinions regarding causation on the complete view of plaintiff's medical records and treatment history, his opinion is given greater weight than that of Drs. Mills and Ewend whose opinions were based upon incomplete information.
21. Plaintiff suffered an injury to her back arising out of and in the course of her employment as a direct result of a specific traumatic incident in the work assigned on 26 September 2001. She reached maximum medical improvement from this injury by 30 December 2001. Dr. Rodger would recommend no repetitive lifting greater than fifty pounds and continued exercise.
22. Based upon the greater weight of the evidence, plaintiff's subsequent treatment by Drs. Gawith and Ewend, and plaintiff's surgery were not related to the incident of 26 September 2001; however, the treatment provided by Dr. Mills upon referral from Dr. Rodger was reasonably required to effect a cure, provide relief or lessen her disability.
23. Plaintiff's termination from employment on 12 November 2001 was unrelated to her compensable injury. Plaintiff's restrictions from her injury did not prevent her from working after 12 November 2001.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury to her back as a result of a specific traumatic incident in the workplace on 26 September 2001. N.C. Gen. Stat. §97-2(6).
2. As a result of the compensable injury, plaintiff is entitled to temporary total disability compensation at the rate of $358.99 per week for the period from 26 September 2001 through 12 November 2001, except for such times as she attempted to return to work during this period. Plaintiff is also entitled to permanent partial disability for fifteen weeks for the 5% rating to her back. N.C. Gen. Stat. §§ 97-29; 97-31(23).
3. Plaintiff is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury which were reasonably required to provide relief, effect a cure or lessen the period of disability, including the treatment provided by Drs. Rodger and Mills, and Mr. Jarboe. N.C. Gen. Stat. § 97-2(19).
4. Plaintiff is not entitled to have defendants pay for the treatment for conditions unrelated to the compensable injury of 26 September 2001, including treatment provided by Drs. Ewend and Gawith. Since Dr. Rodger referred plaintiff to Dr. Mills for pain management and Dr. Rodger opined that he did not think plaintiff was totally asymptomatic based upon subsequent testing and discogram, the treatment provided to plaintiff by Dr. Mills and the testing he initiated are related to her injury. N.C. Gen. Stat. § 97-2(19).
5. Plaintiff was terminated from her employment for reasons that would have resulted in the termination of a non-injured employee and not for reasons related to her compensable injury.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability compensation to plaintiff at the rate of $358.99 per week for the period from 26 September 2001 through 12 November 2001. Defendants are entitled to a credit against this amount for those days that plaintiff worked for defendant-employer. As this compensation has accrued, it shall be paid in a lump sum. Defendants shall also pay to plaintiff in one lump sum, permanent partial disability compensation at the rate of $358.99 per week for fifteen weeks for the 5% impairment to her back.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
3. Defendants shall pay all medical expenses incurred by plaintiff, which were reasonably related to her compensable injury, when bills for the same have been approved in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the ___ day of August 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER